MICHAEL N. FEUER (SBN 111529)
CITY ATTORNEY
*mike.feuer@lacity.org*
JAMES P. CLARK (SBN 64780)
CHIEF DEPUTY CITY ATTORNEY
*james.p.clark@lacity.org*CITY OF LOS ANGELES
200 N. Main Street, Room 800
Los Angeles, CA  90012
Telephone:  (213) 978-8100

STEVE W. BERMAN (*pro hac vice* pending)
*steve@hbsslaw.com*
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 8th Avenue, Suite 3300
Seattle, WA  98101
Telephone:  (206) 623-7292

ELAINE T. BYSZEWSKI (SBN 222304)
*elaine@hbsslaw.com*
LEE M. GORDON (SBN 174168)
*lee@hbsslaw.com*
CHRISTOPHER R. PITOUN (SBN 290235)
*christopherp@hbsslaw.com*
HAGENS BERMAN SOBOL SHAPIRO LLP
301 North Lake Avenue, Suite 203
Pasadena, CA  91101
Telephone:  (213) 330-7150

[Additional Counsel Listed on Signature Page]

*Attorneys for Plaintiff*
*THE PEOPLE OF THE STATE OF CALIFORNIA*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA,<br><br>                                    Plaintiff,<br><br>        v.<br><br>BANK OF AMERICA CORPORATION; BANK OF AMERICA, N.A.; COUNTRYWIDE FINANCIAL CORPORATION; COUNTRYWIDE HOME LOANS; and COUNTRYWIDE BANK, FSB,<br><br>                                    Defendants. | No. 2:14-cv-9744<br><br>COMPLAINT FOR VIOLATION OF THE UNFAIR COMPETITION LAW<br><br>DEMAND FOR JURY TRIAL |

COMPLAINT FOR VIOLATION OF
THE UNFAIR COMPETITION LAW
010346-11  738893 V1

**TABLE OF CONTENTS**

<u>Page</u>

I.   NATURE OF THE ACTION .................................................................... 1

    A.   BoA Has Engaged in a Continuing Pattern of Discriminatory Mortgage Lending Practices in Los Angeles .............................. 1

II.   PARTIES ........................................................................................... 7

III.   REFERRALS FROM BANK REGULATORY AGENCIES ............................ 9

IV.   JURISDICTION AND VENUE.............................................................. 11

V.   FACTUAL BACKGROUND ................................................................. 11

    A.   Background Regarding Discriminatory Loan Practices, Reverse Redlining, and Redlining .................................................. 11

VI.   BOA/COUNTRYWIDE ENGAGED IN DISCRIMINATORY  LENDING PRACTICES ................................................................................. 14

    A.   Specific Allegations Regarding BoA's Countrywide Subsidiary ............ 14

        1.   Mortgage loan channels and loan types. ...................... 14

        2.   Retail Lending Pricing. ................................................ 15

        3.   Wholesale Lending Mortgage Broker Fees. ................. 17

        4.   Wholesale Lending Product Placement. ....................... 22

    B.   BoA/Countrywide's Conduct Had a Disparate Impact on Minority Borrowers in Violation of the Fair Housing Act ..................... 23

        1.   Minority neighborhoods are disproportionate recipients of predatory loans. ....................................................... 23

    C.   BoA/Countrywide Intentionally Discriminated Against Minority Borrowers in Violation of the Fair Housing Act Throughout the Time Period 2004-2011 as Demonstrated by Former Bank Employees ...................................................... 28

        1.   BoA/Countrywide targets minorities for predatory loan terms. ...................................................................... 30

        2.   BoA/Countrywide gives its employees discretion to steer people into predatory loans (and pays its employees more for doing so). ................................................................ 35

        3.   BoA/Countrywide underwrites adjustable rate loans that borrowers cannot afford. ............................................... 37

COMPLAINT FOR VIOLATION OF
THE UNFAIR COMPETITION LAW
010346-11  738893 V1

| | | | |
|---|---|---|---|
| | 4. | BoA/Countrywide gives its employees discretion to include balloon payments. | 38 |
| | 5. | BoA fails to offer refinancing or loan modifications to minority customers on fair terms, and otherwise limiting equal access to fair credit. | 38 |
| | 6. | BoA/Countrywide engages in other abusive lending practices. | 41 |
| D. | | Minorities in Fact Receive Predatory Loan Terms from BoA/Countrywide | 42 |
| E. | | Minorities in Los Angeles Receive Such Predatory Loan Terms from BoA/Countrywide Regardless of Creditworthiness | 43 |

VII.  STATUTE OF LIMITATIONS AND CONTINUING VIOLATIONS DOCTRINE .......................................................................................... 46

VIII. CLAIM FOR RELIEF ........................................................................... 46

CLAIM FOR RELIEF  (VIOLATION OF THE UNLAWFUL PRONG OF THE UNFAIR COMPETITION LAW BASED ON VIOLATION OF THE FEDERAL FAIR HOUSING ACT, 42 U.S.C. §§ 3601, *ET SEQ.*) .................. 46

DEMAND FOR JURY TRIAL ........................................................................ 49

PRAYER FOR RELIEF .................................................................................. 49

COMPLAINT FOR VIOLATION OF
THE UNFAIR COMPETITION LAW
010346-11  738893 V1

The People of the State of California ("People" or "Plaintiff"), by and through the City Attorney for the City of Los Angeles, allege as follows:

## I.   NATURE OF THE ACTION

1.   It is axiomatic that banks should not make discriminatory loans. Banks must extend credit to minorities on equal terms as they do to other similarly situated borrowers. Banks should not target minority neighborhoods for loans that discriminate nor make loans to minorities on terms that are worse than those offered to whites with similar credit characteristics. When banks engage in such conduct, they violate minorities' statutory rights against discrimination. And Plaintiff has a substantial interest in protecting the well-being of its populace – particularly in securing its residents from discrimination.

## A.   BoA Has Engaged in a Continuing Pattern of Discriminatory Mortgage Lending Practices in Los Angeles

2.   This suit is brought pursuant to the unlawful prong of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 *et seq*., based on statutory violations of the Fair Housing Act of 1968 ("FHA"), as amended, 42 U.S.C. §§ 3601, *et seq.*, by the People to seek statutory penalties to redress Bank of America's[1] ("BoA/Countrywide," "BoA" or "the Bank") pattern or practice of illegal and discriminatory mortgage lending. The unlawful conduct alleged herein consists of both intentional discrimination and disparate impact discrimination.

3.   BoA has engaged in a continuous pattern and practice of mortgage discrimination in Los Angeles since at least 2004 by imposing different terms or conditions on a discriminatory and legally prohibited basis. In order to maximize profits at the expense of minority borrowers, BoA adapted its unlawful

---

[1] Defendants collectively are referred to as "BoA," including:  Bank of America Corporation, Bank of America, N.A., Countrywide Financial Corporation, Countrywide Home Loans, and Countrywide Bank, FSB.  Plaintiff alleges that Defendants are also liable for residential home loans and lending operations acquired from, and/or sold by or through, Countrywide Bank, N.A., First Franklin Corporation, Grand Harbor Mortgage, John Laing Homes, Nexstar Financial Corporation, and Treasury Bank National Association.

COMPLAINT FOR VIOLATION OF
THE UNFAIR COMPETITION LAW
010346-11  738893 V1

discrimination to changing market conditions. This unlawful pattern and practice conduct is continuing through the present and has not terminated. Therefore, the operative statute of limitations governing actions brought pursuant to the UCL has not commenced to run.

4.     The pattern and practice of lending discrimination engaged in by BoA consists of traditional redlining[2] and reverse redlining,[3] both of which have been deemed to violate the FHA by federal courts throughout the country.  BoA engaged in redlining, and continues to engage in said conduct, by refusing to extend mortgage credit to minority borrowers in Los Angeles on equal terms as offered to non-minority borrowers.  BoA engaged in reverse redlining, and continues to engage in said conduct, by extending mortgage credit on predatory terms to minority borrowers in minority neighborhoods in Los Angeles on the basis of the race or ethnicity of its residents.  Federal Reserve Chairman Ben Bernanke recently acknowledged these twin evils of mortgage discrimination, and explained that both types of mortgage discrimination "continue to have particular significance to mortgage markets."[4]

5.     Major banks such as BoA have a long history of engaging in redlining throughout Los Angeles.  That practice began to change in the late 1990s, when BoA adapted to changing market conditions, and began to flood historically underserved minority communities with mortgage loans that consisted of a variety of high cost and abusive mortgage loan products with predatory terms as compared to the mortgage loans issued to white borrowers (reverse redlining).

---

[2] Redlining is the practice of denying credit to particular neighborhoods based on race.

[3] Reverse redlining is the practice of flooding a minority community with exploitative loan products.

[4] Remarks by Federal Reserve Chairman Ben Bernanke at the Operation HOPE Global Financial Dignity Summit, Atlanta, Georgia at pg. 10 (November 15, 2012) *available at* www.federalreserve.gov/newsevents/speech/bernanke20121115a.htm.

- 2 -

COMPLAINT FOR VIOLATION OF
THE UNFAIR COMPETITION LAW
010346-11  738893 V1

6.      BoA's discriminatory lending practices have the purpose and effect of placing vulnerable, underserved borrowers in loans they cannot afford.  Reverse redlining maximizes BoA's profit without regard to the borrower's best interest, the borrower's ability to repay, or the financial health of underserved minority neighborhoods.  Moreover, BoA has averted any significant risk to itself by selling the vast majority of mortgage loans it originates or purchases on the secondary market (collectively "BoA Loans").

7.      Between 1996-2006, one category of discriminatory loan products – subprime loans – grew throughout the country from $97 billion to $640 billion.  These loans were frequently targeted to minorities.  Upon information and belief, the lack of accessible credit resulting from BoA's previous pattern and practice of redlining in the minority communities in Los Angeles created conditions whereby the Bank could easily target and exploit the underserved minority communities who, due to traditional redlining, had been denied credit.

8.      Therefore, following several years of issuing abusive, subprime mortgage loans throughout the minority communities of Los Angeles, commencing in or around 2007, BoA once again adapted to changing market conditions, while continuing its pattern and practice of issuing a variety of discriminatory loan products.  Simultaneously, BoA also decided to curtail the issuance of mortgage credit to minority borrowers in Los Angeles.[5]  In other words, BoA not only refused to extend credit to minority borrowers when compared to white borrowers, but when the Bank did extend credit, it did so on predatory terms.  This combination of reverse redlining and redlining represents a continuing and unbroken pattern and practice of mortgage lending discrimination in Los Angeles that still exists today.

---

[5] California Reinvestment Coalition, *From Foreclosure to Re-Redlining* (2010), at 4 (*available at* http://www.calreinvest.org/system/resources/.../Foreclosure_to_Re_Redliningcalreinvest.org/system/resources/.../Foreclosure_to_Re_Redlining.pdf).

- 3 -

9.     The Bank's discriminatory lending practices, including targeting of minorities and the unbridled discretion and incentive arrangements that result in the disproportionate issuance of discriminatory loans to minorities, are evidenced by confidential witness statements provided by former employees of BoA (discussed further herein).  For example:

a)     Looking at BoA loans from 2010-12, an audit firm found many lending irregularities: "We were auditing their stuff to see if there was any fraud or misrepresentations of customers . . . We did find a lot of things."  The audit showed that a high rate of African-American and Hispanic borrowers "were taken advantage of" by BoA.

b)     Countrywide "gathered people who were the best" and "given the opportunity to do more loans," which turned out to be a license to "basically do anything with anybody's loans that you want and the supervisor would never say anything." Management "orchestrated the whole thing." The loans would be approved by using "creative finance;" if team members did not play along, "you could possibly [be] fired, let go, not given additional leads, things like that."

c)     "We were doing this huge push, where we were targeting lower-income areas", in the City of Los Angeles. "It was understood that this was the prime target, would be that particular demographic, and that particular demographic was unfortunately minorities who were struggling in their loans and who couldn't pay their mortgages."  Loan officers were under "an extreme amount of pressure" to make loan quotas, and there "was a lot going on that was not properly monitored."

d)     "They are going to take prime people and put people in subprime because they make more money".

e)     The Bank's management "would come back and say, 'you know this person is a minority.  You can go a little higher (on debt ratio).'"

f)     Regarding the lack of refinancing and loan modifications offered to minority borrowers: "Management would tell us, if the borrower doesn't qualify because they're not in foreclosure, because they aren't delinquent in the system, tell them to call us back when they can't pay their mortgage anymore."

- 4 -

10.     The reports of these witnesses are confirmed when Los Angeles data on BoA loans is examined.  Such an examination reveals a widespread practice of discrimination.  For example, a regression analysis that controls for credit history and other factors demonstrates that an African-American BoA borrower was 1.522 times more likely to receive a predatory loan than is a white borrower, and a Latino borrower is 1.325 times more likely to receive such a loan.  The regression analysis confirms that African-Americans with FICO scores over 660 are 1.396 times more likely to receive a predatory BoA loan as is a white borrower, and a Latino borrower is 1.167 times more likely to receive such a loan.

11.     According to a Justice Department complaint, BoA's Countrywide subsidiary:  (i) had charged upwards of 200,000 minority homeowners higher interest rates and fees than white borrowers who were similarly qualified, with similar credit ratings; (ii) had failed to offer minority homeowners conventional mortgages for which they qualified and which they would have been offered, were they white; and (iii) systematically pushed minority borrowers into exploitative mortgages with higher rates and fees.

12.     The past several years have been highly profitable for BoA.  The following charts illustrate these results.

- 5 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Net Income (millions)



Earnings per share



13.    In this action the People seek injunctive relief to halt the discriminatory lending described herein and penalties based on each discriminatory loan issued and/or each mortgage payment made pursuant to a discriminatorily issued loan by Defendants.

- 6 -

## II.    PARTIES

14.    Michael Feuer, City Attorney for the City of Los Angeles, acting to protect the public as borrowers from unlawful business practices, brings this action in the public interest in the name of the People of the State of California pursuant to section 17200 of the California Business and Professions Code.  Plaintiff, by this action, seeks to enjoin Defendants from engaging in the unlawful business practices alleged herein, and seeks civil penalties for the Defendants violations of the above statute.

15.    Bank of America, N.A. is organized as a national banking association under the laws of the United States.  Upon information and belief, its corporate headquarters are located in Charlotte, North Carolina.  It maintains multiple offices in the State of California, including in the City of Los Angeles, for the purposes of soliciting applications for and making residential mortgage loans and engaging in other business activities.

16.    During the period of time relevant to the events at issue in this Complaint through July 1, 2008, Defendant Countrywide Financial Corporation ("CFC") was a Delaware-incorporated financial holding company or savings and loan holding company with its principal business office in Calabasas, California. CFC created, authorized, and/or ratified the lending-related policies and practices at issue in this Complaint that its divisions and subsidiaries implemented.

17.    On July 1, 2008, Defendant Bank of America Corporation ("BAC"), a Delaware-incorporated financial holding company, acquired ownership of CFC, including all of its subsidiary business entities.  Since that acquisition, CFC has remained a Delaware-incorporated company with its principal business office in Calabasas, California, as a direct, wholly-owned subsidiary of BAC.

18.    Defendant Countrywide Home Loans, Inc. ("CHL") is a New York-incorporated wholly-owned subsidiary of CFC with its principal business office in

- 7 -

COMPLAINT FOR VIOLATION OF
THE UNFAIR COMPETITION LAW
010346-11  738893 V1

Calabasas, California.  Prior to 2008, CHL funded the majority of CFC's nationwide residential mortgage loan origination activity.  For the loans it funded under the Countrywide name, CHL was the named lender on the promissory notes for those loans.  CHL became a wholly-owned indirect subsidiary of BAC on or about July 1, 2008, as a result of BAC's acquisition of CFC.

19.     Defendant Countrywide Bank, FSB ("CWB") was originally chartered as a national bank subject to supervision by the Office of the Comptroller of the Currency, and was a subsidiary of financial holding company CFC.  CWB was headquartered in Alexandria, Virginia, until February, 2009.  As a financial holding company, CFC, together with its subsidiary CHL, was supervised by the Board of Governors of the Federal Reserve System.  On or about March 12, 2007, CWB changed its charter to that of a federal savings association, and CFC became a savings and loan holding company.  Those changes caused CWB, CFC, and CHL to become subject to supervision by the Office of Thrift Supervision.

20.     During 2006, CFC began the process of transitioning the funding of its residential loan originations from CHL to CWB.  For those loans funded through CWB under the Countrywide name, CWB was the named lender on the promissory notes for those loans.  As of January 1, 2008, CWB funded substantially all nationwide residential loan origination activity using the Countrywide name.  For those loans funded by either CHL or CWB, CFC used the same loan origination policies and procedures that it had created, authorized, or ratified, and the same employees and mortgage brokers.  Throughout this Complaint, CFC, CWB, and CHL are referred to collectively as "Countrywide."

21.     Even after BAC's purchase of CFC on July 1, 2008, CWB continued its banking and mortgage lending operations as a direct subsidiary of CFC, using the same loan origination policies and procedures, until approximately November 7,

- 8 -

COMPLAINT FOR VIOLATION OF
THE UNFAIR COMPETITION LAW
010346-11 738893 V1

2008.  At that time, BAC engaged in a series of corporate transactions that ended CWB's status as a subsidiary of CFC and made CWB a direct subsidiary of BAC.

22.   On April 23, 2009, the Office of the Comptroller of the Currency approved CWB's request to convert its charter back to that of a national bank and the request by Bank of America, N.A. to then immediately acquire CWB by merger. These transactions were executed on April 27, 2009, as a result of which CWB ceased to exist.  Bank of America, N.A. was the surviving institution resulting from this merger.  Thus, Bank of America, N.A. is the successor in interest to CWB.

23.   Based on information reported pursuant to the Home Mortgage Disclosure Act, in addition to loans that Defendants originated directly, Defendants are responsible for residential home loans acquired from, and/or sold by or through, Merrill Lynch Bank & Trust FSB, Merrill Lynch Credit Corp., and First Franklin Financial Corp.

24.   Upon information and belief, Plaintiff alleges that each of the Defendants was and is an agent of the other Defendants.  Each Defendant, in acting or omitting to act as alleged in this Complaint, was acting in the course and scope of its actual or apparent authority pursuant to such agencies, and/or the alleged acts or omissions of each Defendant as agent were subsequently ratified and adopted by each agent as principal.  Each Defendant, in acting or omitting to act as alleged in this Complaint, was acting through its agents, and is liable on the basis of the acts and omissions of its agents.

### III.   REFERRALS FROM BANK REGULATORY AGENCIES

25.   In 2006, Federal Reserve System Examiners initiated a fair lending review of CHL's mortgage pricing practices.  As a result of that review, the Federal Reserve Board ("FRB") determined that it had "reason to believe that Countrywide Home Loans engaged in a pattern or practice of discrimination based on race and

COMPLAINT FOR VIOLATION OF
THE UNFAIR COMPETITION LAW
010346-11  738893 V1

ethnicity in violation of Section 701(a) of the Equal Credit Opportunity Act and the Fair Housing Act."

26.     Following its determination described in Paragraph 36, and pursuant to 15 U.S.C. § 1691e(g), the FRB referred the matter to the Department of Justice on March 5, 2007.  Countrywide agreed that various statutes of limitations for any cause of action that could be brought against Countrywide pursuant to the FRB referral would be tolled from March 22, 2007 through December 22, 2011.

27.     In early 2008, the Office of Thrift Supervision ("OTS") conducted an examination of the operations of Countrywide, including its compliance with applicable fair lending laws and regulations.  As a result of that examination, the OTS determined that it had "a 'reason to believe' that Countrywide has displayed a 'pattern or practice' of discriminating against minority loan applicants in the pricing of home loans and against married couples concerning the terms and condition of home loans."

28.     Following its determination described in Paragraph 38, and pursuant to 15 U.S.C. § 1691e(g), the OTS referred the matter to the Department of Justice on June 27, 2008. Countrywide agreed that various statutes of limitations for any cause of action that could be brought against Countrywide pursuant to the OTS referral would be tolled from July 1, 2009 through December 22, 2011.

29.     Based on the FRB and OTS referrals, the Department of Justice engaged in a lengthy investigation of Countrywide's lending policies, practices, and procedures, including reviewing millions of Countrywide loans originated between 2004 and 2008.  The investigation led to the Justice Department's complaint against Countrywide for discriminatory lending practices affecting upwards of 200,000 minority homeowners (saddling them with higher interest rates and fees than white borrowers who were similarly qualified, with similar credit ratings).

COMPLAINT FOR VIOLATION OF
THE UNFAIR COMPETITION LAW
010346-11 738893 V1

## IV.   JURISDICTION AND VENUE

30.   This Court has jurisdiction over this matter pursuant to 42 U.S.C. § 3613 and 28 U.S.C. §§ 1331, 1343, because the claims alleged herein arise under the laws of the United States.  Plaintiff's unlawful prong claim under the UCL necessarily requires determination whether Defendants violated the FHA.

31.   Venue is proper in this district under 28 U.S.C. § 1391(b) because bank of America, N.A., BAC, and Countrywide all conduct business in this district, and a substantial part of the events and omissions giving rise to the claims occurred in this district.

## V.   FACTUAL BACKGROUND

### A.   Background Regarding Discriminatory Loan Practices, Reverse Redlining, and Redlining

32.   Prior to the emergence of subprime lending, most mortgage lenders made only "prime" loans.  Prime lending offered uniformly priced loans to borrowers with good credit, but individuals with lower credit were not eligible for prime loans.

33.   Subprime lending developed and began growing rapidly in the mid-1990s as a result of technological innovations in risk-based pricing and in response to the demand for credit by borrowers who were denied prime credit by traditional lenders.  Advances in automated underwriting allowed lenders to predict with improved accuracy the likelihood that a borrower with lower credit will successfully repay a loan.  These innovations gave lenders the ability to adjust the price of loans to match the different risks presented by borrowers whose credit records did not meet prime standards.  Lenders found that they could now accurately price loans to reflect the risks presented by a particular borrower.  When done responsibly, this made credit available much more broadly than had been the case with prime lending.

34.   Responsible subprime lending has opened the door to homeownership to many people, especially low- to moderate-income and minority consumers, who

otherwise would have been denied mortgages.  At the same time, however, subprime lending has created opportunities for unscrupulous lenders to target minorities and engage in discriminatory, irresponsible lending.

35.     Enticed by the prospect of profits resulting from exorbitant origination fees, points, and related pricing schemes, some irresponsible subprime lenders took advantage of a rapidly rising real estate market to convince borrowers to enter into discriminatory loans.  Often this was accomplished with the help of deceptive practices and promises to refinance at a later date.  Once made, a significant number of the loans were sold on the secondary market.

36.     As the subprime market grew, the opportunities for abusive practices grew with it.  As a consequence, the federal government has found that abusive and predatory practices "are concentrated in the subprime mortgage market."[6]  These practices, which in recent years have become the target of prosecutors, legislators, and regulators, include the following:

        a.     Placing borrowers in subprime loans even though they qualify for prime or conventional loans on better terms.

        b.     Failing to prudently underwrite hybrid adjustable rate mortgages (ARMs), such as 2/28s and 3/27s.[7]  After the borrower pays a low "teaser rate" for the first two or three years, the interest rate on these loans resets to a much higher rate that can continue to rise based on market conditions.  Subprime lenders often underwrite these loans based only on consideration of whether the borrower can

---

[6] United States Department of Housing & Urban Development and United States Department of the Treasury, Curbing Predatory Home Mortgage Lending (2000), at 1 (*available at* http://www.huduser.org/Publications/pdf/treasrpt.pdf) ("HUD/Treasury Report").

[7] In a 2/28 ARM, the "2" represents the number of years the mortgage will be fixed over the term of the loan, while the "28" represents the number of years the interest rate paid on the mortgage will be variable.  Similarly, in a 3/27 ARM, the interest rate is fixed for three years and variable for the remaining 27-year amortization.

make payments during the initial teaser rate period, without regard to the sharply higher payments that will be required for the remainder of a loan's 30-year term. Irresponsible lenders aggressively market the low monthly payment that the borrower will pay during the teaser rate period, misleading borrowers into believing that they can afford that same low monthly payment for the entire 30-year term of the loan, or that they can refinance their loan before the teaser rate period expires.

c.     Failing to prudently underwrite refinance loans, where borrowers substitute unaffordable mortgage loans for existing mortgages that they are well-suited for and that allow them to build equity.  Such refinanced loans strip much or even all of that equity by charging substantial new fees, often hiding the fact that the high settlement costs of the new loan are also being financed.  Lenders that aggressively market the ability of the borrower to pay off existing credit card and other debts by refinancing all of their debt into one mortgage loan mislead borrowers into believing that there is a benefit to debt consolidation, while obscuring the predictable fact that the borrower will not be able to repay the new loan.  The refinanced loans are themselves often refinanced repeatedly with ever-increasing fees and higher interest rates, and with ever-decreasing equity.

d.     Allowing mortgage brokers to charge "yield spread premiums" for qualifying a borrower for an interest rate that is higher than the rate the borrower qualifies for and can actually afford.

e.     Failing to underwrite loans based on traditional underwriting criteria such as debt-to-income ratio, loan-to-value ratio, FICO score, and work history.  These criteria ensure that a borrower is obtaining a loan that he or she has the resources and assets to repay, and ignoring these criteria results in many loans that bear no relation to borrowers' ability to repay them – but allows the lender to make a quick profit from the origination.

f.      Requiring substantial prepayment penalties that prevent borrowers whose credit has improved from refinancing their subprime loan to a prime loan.  Prepayment penalties not only preclude borrowers from refinancing to a more affordable loan, but reduce the borrowers' equity when a subprime lender convinces borrowers to needlessly refinance one subprime loan with another.

g.      Charging excessive points and fees that are not associated with any increased benefits for the borrower.

37.    The problem of predatory practices in subprime mortgage lending is particularly acute in minority communities because of "reverse redlining."  As used by Congress and the courts, the term "reverse redlining" refers to the practice of targeting residents in certain geographic areas for credit on unfair terms due to the racial or ethnic composition of the area.  This is in contrast to "redlining," which is the practice of denying *prime* credit to specific geographic areas because of the racial or ethnic composition of the area.  Both practices have repeatedly been held to violate the federal Fair Housing Act.

38.    Following the onset of the subprime mortgage crisis, and after years of issuing abusive home loans in minority neighborhoods, the big bank lenders began to limit the issuance of mortgage credit to minority borrowers (*i.e.*, refusing to refinance predatory loans).  At the same time, when the big banks did extend credit, they continued to do so on predatory terms.

## VI.    BOA/COUNTRYWIDE ENGAGED IN DISCRIMINATORY LENDING PRACTICES

## A.    Specific Allegations Regarding BoA's Countrywide Subsidiary

### 1.    Mortgage loan channels and loan types.

39.    Between January 2004 and December 2008, Countrywide originated residential loans nationwide through both a retail channel and a wholesale channel.

COMPLAINT FOR VIOLATION OF
THE UNFAIR COMPETITION LAW
010346-11  738893 V1

40.     Between 2004 and 2008, Countrywide's retail and wholesale divisions operated in virtually all geographical markets in the United States, including several hundred metropolitan areas ("MSAs"), including specifically the Los Angeles MSA.

41.     Between at least January 2004 and August 2007, Countrywide originated virtually every type of loan product that was available in the residential lending market, several hundred products in all. Among others, these products included:  (a) traditional prime loans (least risky); (b) subprime loans (most risky), typically designed for borrowers with credit scores or other credit characteristics deemed too weak to qualify for prime loans; and (c) "Alt-A" loans (risk level between prime and subprime loans), with application requirements or payment terms less restrictive than traditional prime loan terms or requirements, such as interest-only or negative amortization terms, reduced documentation requirements, or balloon payments. Subsequent to origination, Countrywide sold or securitized for sale the bulk of the loans it originated in the secondary market, either to government-sponsored entities Fannie Mae and Freddie Mac, or to private investors.

**2.      Retail Lending Pricing.**

42.     Between 2004 and 2008, Countrywide charged more than 100,000 Hispanic and African-American borrowers higher fees and costs than non-Hispanic White retail borrowers, not based on their creditworthiness or other objective criteria related to borrower risk, but because of their race or national origin.  It was Countrywide's business practice to allow its employees who originated loans through its retail channel to vary a loan's interest rate and other fees from the price initially set based on a borrower's objective credit-related factors.  As a result of Countrywide's discriminatory retail pricing practices, a Hispanic or African-American borrower paid, on average, hundreds of dollars more for a Countrywide loan.

- 15 -

COMPLAINT FOR VIOLATION OF
THE UNFAIR COMPETITION LAW
010346-11  738893 V1

43.     Countrywide's retail channel consisted of two primary divisions.  The larger, the Consumer Markets Division ("CMD"), originated Countrywide's non-subprime residential loan products.  Countrywide employed retail loan officers and other employees at each CMD branch and call center to solicit applications for, and originate residential loans to, individual loan applicants.

44.     Beginning prior to January 2004 and continuing through at least December 2008, Countrywide utilized a two-tier decision-making process to set the interest rates and other terms and conditions of retail loans it originated.  The first step involved setting the credit risk-based prices on a daily basis for Countrywide's various home mortgage loan products, including interest rates, loan origination fees, and discount points.  In this step, Countrywide accounted for numerous objective credit-related characteristics of applicants by setting a variety of prices for each of the different loan products that reflected its assessment of individual applicant creditworthiness, as well as the current market rate of interest and the price it could obtain from the sale of such a loan to investors.  These prices, referred to as par or base prices, were communicated through rate sheets, which were available electronically to its retail mortgage loan officers and other retail lending employees.  Individual loan applicants did not have access to these rate sheets.

45.     As the second step in determining the final price it would charge an applicant for a loan, Countrywide allowed its retail mortgage loan officers, and other employees who participated in the loan origination process, to increase the loan price charged to borrowers over the rate sheet prices set by Countrywide, up to certain caps; this pricing increase was labeled an overage.  Countrywide also allowed these same employees to decrease the loan price charged to borrowers below the stated rate sheet prices; this pricing decrease was labeled a shortage.  Countrywide further allowed those employees to alter the standard fees it charged in connection with processing a loan application and the standard allocation of closing costs between

- 16 -

Countrywide and the borrower.  Employees made these pricing adjustments in a subjective manner, unrelated to factors associated with an individual applicant's credit risk.  Countrywide provided no written guidance to its retail loan officers or other employees about the criteria they should consider in adjusting risk-based prices during the time period at issue.  It did not establish an operational system for the documentation and supervisory review of their adjustments prior to loan origination.

46.    During the time period at issue, Countrywide loan officer compensation was affected by the loan officers' decisions with respect to pricing overages and shortages, as well as other factors, such as volume of loans originated.  Loan officers could obtain increased compensation for overages, and could have their total compensation potentially decreased for shortages.  Countrywide's compensation policy thus provided an incentive for its loan officers in making pricing adjustments to maximize overages and, when offering shortages, to minimize their amount.

47.    Countrywide regularly calculated a Net Pricing Exception ("NPE") for each retail loan it funded, subsequent to origination.  The NPE approximates the amount, positive or negative, by which the total cost of a loan to a borrower differs from the total cost of that loan had it closed at the rate sheet price, with the borrower paying standard fees and with a standard allocation of closing costs between the borrower and Countrywide.  A positive NPE was an overage, and a negative NPE was a shortage.

48.    For each residential loan that Countrywide retail mortgage loan officers originated, information about each borrower's race and national origin and the amount of overage or shortage paid was available to, and was known by, Countrywide.

**3.     Wholesale Lending Mortgage Broker Fees.**

49.    Between 2004 and 2008, Countrywide charged more than 100,000 Hispanic and African-American wholesale borrowers higher fees and costs than non-

- 17 -

Hispanic White wholesale borrowers, not based on their creditworthiness or other objective criteria related to borrower risk, but because of their race or national origin. It was Countrywide's business practice to allow its mortgage brokers who generated loan applications through its wholesale channel to vary a loan's interest rate and other fees from the price set based on a borrower's objective credit-related factors. As a result of Countrywide's discriminatory practices, a Hispanic or African-American borrower paid, on average, hundreds of dollars more for a Countrywide loan.

50.    Prior to January 2004, and continuing at least until December 2008, Countrywide originated and funded residential loans of all types, including both subprime and non-subprime loans, through its Wholesale Lending Division ("WLD").  Applications for these loans were brought to Countrywide during those years by mortgage brokers throughout the United States who had entered into contracts with Countrywide for the purpose of bringing loan applications to it for origination and funding.

51.    Countrywide's relationship with the mortgage brokers who brought loans to it was governed throughout the time period at issue by its standard Wholesale Broker Agreement ("WBA").  The WBA, while revised from time to time, consistently contained extensive provisions (a) mandating that a broker act in compliance with all Countrywide policies, (b) requiring submission to Countrywide of the full details of all compensation a broker received for each Countrywide loan, (c) specifying that the decision whether to fund a loan application was Countrywide's alone, and (d) permitting Countrywide to obtain any information with respect to a broker's business operations.

52.    Countrywide was directly and extensively involved in setting the complete, final terms and conditions of wholesale loan applications generated by mortgage brokers that Countrywide approved and originated.  Countrywide

- 18 -

employed wholesale account executives who worked with mortgage brokers in submitting loan applications to Countrywide, and it employed underwriters to determine whether and on what terms to approve and fund wholesale loan applications.  At the time of originating each loan, Countrywide was fully informed of those terms and conditions, including the fees it passed along to brokers, and it incorporated those terms and conditions into the wholesale loans it originated.

53.    Prior to January 2004 and until December 2008, Countrywide set terms and conditions, including interest rates, on a daily basis for its various home mortgage loan products available through its wholesale loan channel.  Countrywide accounted for numerous applicant credit risk characteristics by setting a range of prices for each of the different loan products it offered that reflected applicant creditworthiness.  It communicated these loan product prices to its brokers through rate sheets updated daily.  Individual loan applicants did not have access to these rate sheets.

54.    Under its WBA, Countrywide authorized brokers to inform prospective borrowers of the terms and conditions under which a Countrywide residential loan product was available.  Countrywide did not require the mortgage brokers to inform a prospective borrower of all available loan products for which he or she qualified, of the lowest interest rates and fees for a specific loan product, or of specific loan products best designed to serve the interests expressed by the applicant.

55.    Between 2004 and 2008, Countrywide operated between 39 and 52 WLD branch offices and several regional centers, and employed wholesale account executives to work with mortgage brokers in originating loans, which included assisting the brokers in setting the terms and conditions of loan applications and approvals.

56.    Mortgage brokers who supplied Countrywide with loan applications that Countrywide funded were compensated in two ways.  One was through a yield

- 19 -

COMPLAINT FOR VIOLATION OF
THE UNFAIR COMPETITION LAW
010346-11  738893 V1

spread premium ("YSP"), an amount paid by Countrywide to the brokers based on the extent to which the interest rate charged on a loan exceeded the base, or par, rate for that loan to a borrower with particular credit risk characteristics fixed by Countrywide and listed on its rate sheets.  The YSP is derived from the present dollar value of the difference between the credit risk-determined par interest rate a wholesale lender such as Countrywide would have accepted on a particular loan and the interest rate a mortgage broker actually obtained for Countrywide.  Countrywide benefitted financially from the loans it made at interest rates above the par rates set by its rate sheets.  For those loans that it sold or securitized, higher interest rates meant sales at prices higher than it otherwise would have obtained; for loans it retained, higher interest rates meant more interest income over time for it.  The second way brokers were compensated was through direct fees.  Countrywide directed its closing agents to pay these direct fees to brokers out of borrowers' funds at the loan closing.  Taken together, these two forms of compensation are referred to in this Complaint as "total broker fees."

57.     During the time period at issue, Countrywide was fully informed of all broker fees to be charged with respect to each individual residential loan application presented to it.  Countrywide included fees from the broker's application package in the calculations it made to prepare various closing documents, including the HUD-I Form, an itemized statement of receipts and expenditures in connection with a residential loan closing, and the Truth in Lending Act Disclosure Statement.  Countrywide also included these fees in its instructions on how to distribute funds at closing.  Total broker fees raised the annual percentage rate ("APR") charged on a loan, and could increase the note interest rate and the total amount borrowed.

58.     Between at least January 2004 and December 2008, Countrywide's policies and practices established a two-step process for the pricing of wholesale loans that it originated similar to that used in its retail division.  The first step was to

- 20 -

establish a base or par rate for a particular type of loan for an applicant with specified credit risk characteristics.

59.     Countrywide's second step of pricing wholesale loans permitted mortgage brokers to set the amount of total broker fees charged to individual borrowers, unrelated to an applicant's credit risk characteristics.

60.     Total broker fees for an average subprime loan were notably higher than total broker fees on a similarly-sized non-subprime loan.  Other than certain broker fee caps, Countrywide did not establish any objective criteria, or provide guidelines, instructions, or procedures to be followed by brokers (a) in setting the amount of direct fees they should charge or (b) in determining to charge an interest rate for a loan above that set by its rate sheet, which in turn determined the amount of YSP Countrywide would pay the broker.  Mortgage brokers exercised this fee pricing discretion Countrywide gave them, untethered to any objective credit characteristics, on every loan they brought to Countrywide for origination and funding. Countrywide affirmed or ratified these discretionary fee pricing decisions for all the brokered loans it originated and funded.  Each year during this time period when Countrywide had in place higher fee caps for subprime than prime loans, Countrywide's mortgage brokers charged higher average total fees for subprime loan applications than for non-subprime loan applications, measured on a nationwide basis.

61.     Countrywide's compensation policy and practice created a financial incentive for mortgage brokers to submit subprime loans to Countrywide for origination rather than other types of residential loan products.

62.     For each residential loan application obtained by mortgage brokers and subsequently funded by Countrywide, information about each borrower's race and national origin and the amount and types of broker fees paid was available to, and was known by, Countrywide.

- 21 -

COMPLAINT FOR VIOLATION OF
THE UNFAIR COMPETITION LAW
010346-11  738893 V1

**4.      Wholesale Lending Product Placement.**

63.      Between 2004 and 2007, Countrywide placed more than 10,000 Hispanic and African-American wholesale borrowers into subprime loans even though non-Hispanic White wholesale borrowers who had similar credit qualifications were placed into prime loans.  As a result of being placed into an illegal discriminatory loan, a Hispanic or African-American borrower paid, on average, thousands of dollars more for a Countrywide loan.  It was Countrywide's business practice to allow its mortgage brokers and employees to place a wholesale loan applicant in a subprime loan even when the applicant qualified for a prime loan according to Countrywide's underwriting practices.

64.      Countrywide also gave mortgage brokers discretion to request exceptions to underwriting guidelines, and Countrywide's employees had discretion to grant these exceptions.  These policies and practices resulted in the placement of Hispanic and African-American borrowers into discriminatory loans (based on criteria other than strict adherence to its published underwriting guidelines), when similarly-situated non-Hispanic White borrowers were placed into prime loans, both on a nationwide basis and in dozens of geographic markets across the country (including Los Angeles), where Countrywide originated a large volume of wholesale loans.  Between at least January 2004 and August 2007, Countrywide attempted to implement a system that would "flag" subprime loan applicants eligible to be "uplifted" to a non-subprime loan product.  This system flagged thousands of Hispanic and African-American loans.  However, this pre-origination "uplift" system only required that notification of potential uplift eligibility be given to brokers, and neither required the brokers to inform applicants of this fact, nor obligated the brokers to take any other specific action with respect to identified applicants.  Moreover, this "uplift" system did not accurately correspond to Countrywide's actual underwriting practices for non-subprime loan products that treated published

COMPLAINT FOR VIOLATION OF
THE UNFAIR COMPETITION LAW
010346-11  738893 V1

underwriting guidelines as merely advisory, and widely granted exceptions.  As a result, the system both failed to identify a large proportion of applicants who received a subprime loan whose qualifications were similar to those of applicants who received non-subprime loan products, and resulted in few "flagged" applicants receiving a non-subprime loan.

**B.      BoA/Countrywide's Conduct Had a Disparate Impact on Minority Borrowers in Violation of the Fair Housing Act**

**1.      Minority neighborhoods are disproportionate recipients of predatory loans.**

65.      There is a substantial body of empirical evidence demonstrating the prevalence of reverse redlining in the subprime mortgage market.  These studies show that, even after controlling for creditworthiness and other legitimate underwriting factors, subprime loans and the predatory practices often associated with subprime lending are disproportionately targeted at minority neighborhoods.[8]

66.      In general, as recently observed by the Federal Reserve in December 2012, both African-American and Hispanic borrowers were far more likely (in fact, nearly twice more likely) to obtain higher-priced loans than were white borrowers.  These relationships hold both for home-purchase and refinance lending and for non-conventional loans.  These differences are reduced, but not eliminated, after controlling for lender and borrower characteristics.  "Over the years, analyses of

---

[8] *See* Abt Associates, *Using Credit Scores to Analyze High-Cost Lending in Central City Neighborhoods* (2008); Center for Responsible Lending, *Lost Ground, 2011: Disparities in Mortgage Lending and Foreclosures* (2011) (*available at* www.responsiblelending.org/mortgage-lending/research-analysis/Lost-Ground--2011.pdf ); Center for Responsible Lending, *Unfair Lending: The Effect of Race and Ethnicity on the Price of Subprime Mortgages* (2006) (*available at* http://www.responsiblelending.org/mortgage-lending/research-analysis/rr011-Unfair_Lending-0506.pdf); Finance and Economics Discussion Series Divisions of Research & Statistics and Monetary Affairs Federal Reserve Board, Washington, D.C, *Subprime Mortgages: What, Where, and to Whom?* (2008) (*available at* http://www.nber.org/papers/w14083.pdf?new_window=1 ); C. Reid and E. Laderman, Federal Reserve Bank of San Francisco, *The Untold Costs of Subprime Lending: Examining the Links among Higher-Priced Lending, Foreclosures and Race in California*, Presented at Brandeis University (2009) (*available at* http://iasp.brandeis.edu/pdfs/Author/reid-carolin/The%20Untold%20Costs%20of%20Subprime%20Lending%203.pdf).

- 23 -

HMDA data have consistently found substantial differences in the incidence of higher-priced lending and in application denial rates across racial and ethnic lines, differences that cannot be fully explained by factors included in the HMDA data."[9]

67.     African-Americans and Hispanics were much more likely to receive subprime loans and loans with predatory features, specifically prepayment penalties and hybrid or option ARMs.  These disparities were evident even comparing borrowers within the same credit score ranges.  In fact, the disparities were especially pronounced for borrowers with higher credit scores.  For example, among borrowers with a FICO score of over 660 (indicating good credit), African-Americans and Latinos received a high interest rate loan more than three times as often as white borrowers.[10]

68.     In addition to receiving a higher proportion of higher-rate loans, African-Americans and Latinos also were much more likely to receive loans with other risky features, such as hybrid and option ARMs and prepayment penalties. Disparities in the incidence of these features are evident across all segments of the credit spectrum.[11]

69.     A 2010 Report from the California Reinvestment Coalition finds: "[The] hardest-hit communities are racially concentrated, low to moderate income areas of African-Americans and Latinos that were saturated with high-cost, subprime lending since 2000.  Neighborhoods once redlined – where lenders refused to lend in neighborhoods of color without regard to the actual financial qualifications of residents – were flooded in the past decade with high-cost subprime loans and abusive option ARM loans.  These loans were often unaffordable and unsustainable

---

[9] Federal Reserve Bulletin, *The Mortgage Market in 2011: Highlights from the Data Reported under the Home Mortgage Disclosure Act* (Dec. 2012) (*available at* http://www.federalreserve.gov/pubs/bulletin/2012/PDF/2011_HMDA.pdf).

[10] Center for Responsible Lending, *Lost Ground, 2011: Disparities in Mortgage Lending and Foreclosures* (2011) (*available at* www.responsiblelending.org/-mortgage-lending/research-analysis/*Lost-Ground-2011*.pdf).

[11] *Id.*

for working class families, and inevitably led to large scale foreclosures.  In the past two years, borrowers and communities struggling to preserve their primary asset – their home – have found that banks are not willing to work with them to restructure their mortgages or to offer new loans."[12]  Key findings from the 2010 Report include:

(a)  California cities are more likely than the national average to be saturated with low documentation loans (*e.g.*, stated income loans).  In Los Angeles, 74% of all loans in the sample were made with limited documentation, as compared to only 56% for all loans in the sample.

(b)  Minority neighborhoods saw a dramatic decrease in lower cost prime loans in 2008.  The drop off from 2006 to 2008 was stunning.  In Los Angeles, less than 1/3rd as many prime loans were made available by big bank lenders in minority neighborhoods in 2008, as compared to 2006.

(c)  In 2008, nearly one out of two African-Americans and Latinos seeking a home loan or refinance were denied, as compared to only about one in four whites.

(d)  Even though high-cost lending began to decrease significantly by 2008, when it occurred, it was still more likely to occur in minority neighborhoods as compared to white neighborhoods.  The big bank lenders still were more than twice more likely to sell subprime loans in minority neighborhoods in Los Angeles, as compared to white neighborhoods.

(f)  In many cases, minority borrowers were overburdened not only by subprime lending but by other onerous loan terms, such as prepayment penalties, yield spread premiums, option ARMs, and HELOCs.

(g)  In the wake of the subprime meltdown, as underwriting tightened for all loans, higher cost FHA mortgage loans were the "only game in town" left for many new homebuyers.

---

[12] California Reinvestment Coalition, *From Foreclosure to Re-Redlining,* at 1 (2010) (*available at* http://www.calreinvest.org/system/resources/.../Foreclosure_to_Re_Redlining.pdf).

COMPLAINT FOR VIOLATION OF
THE UNFAIR COMPETITION LAW
010346-11  738893 V1

70.     Since 2008, as the data discussed below makes clear, there has been a shift in the types of loans issued – and not issued – by the Bank.  For example, the Bank shifted from offering new subprime loans toward issuing more Home Equity Lines of Credit ("HELOCs") and higher cost FHA/VA loans.[13]  FHA and VA government loans are characterized as higher risk loans because they are typically more expensive for a borrower than conventional loans and include fees and costs not associated with conventional loans.[14]  Additionally, this fact is further corroborated by the FHA/VA Mortgage Programs webpage for one of the defendant banks in the People's related lending cases.  According to Wells Fargo's website: (a) "In many instances, you may find FHA to be a more expensive financing option and should be considered after thoroughly evaluating all other product options that meet your credit qualifying and financial needs;" (b) "You typically have to pay upfront and monthly FHA mortgage insurance premiums;" and (c) "You typically have to pay a one-time VA funding fee that can be financed into the loan amount."[15]

71.     A 2011 Report from the California Reinvestment Coalition found that between 2008 and 2009, in Los Angeles, the number of conventional refinance loans made in predominantly white neighborhoods more than doubled (increasing by about 200%), while conventional refinance loans declined in Los Angeles's minority neighborhoods where such refinancing was most desperately needed.[16]

[13] While FHA/VA loans are not inherently predatory, these loans have higher risk features such as higher fees and higher interest rates.  When banks target minorities for FHA/VA loans and issue more of them to minorities, they are acting in a discriminatory manner.

[14] California Reinvestment Coalition, et al., *Paying More for the American Dream VI, Racial Disparities in FHA/VA Lending* (July 2012); www.fha.com/fha_loan_types; www.benefits.va.gov/homeloans.

[15] https://www.wellsfargo.com/mortgage/loan-programs/fha-va-loans.

[16] California Reinvestment Coalition, *et al.*, *Paying More for the American Dream V: The Persistence and Evolution of the Dual Market* (2011) (*available at* http://www.community-wealth.org/sites/clone.community-wealth.org/files/downloads/report-crc-et-al.pdf).

- 26 -

COMPLAINT FOR VIOLATION OF
THE UNFAIR COMPETITION LAW
010346-11 738893 V1

72.     At the same time that conventional credit has contracted over the past five years, FHA lending has expanded dramatically.  During the subprime boom, FHA lending fell as subprime lenders targeted minority communities.  Now, with little or no subprime lending, and conventional credit restricted, FHA lending has shot up.  Overall, the share of loans with government backing went from 5% in 2005 to 26.6% in 2010.[17]

73.     For African-Americans, the share of mortgages used to purchase a home and backed by a government program increased to almost 80% in 2010; for Latinos the share increased to 73%.  But for whites, the share increased to only 49%.  At present, most minority borrowers cannot gain access to the conventional mortgage market and instead, are relegated to more expensive FHA loans.[18]

74.     A 2012 Report from the California Reinvestment Coalition "shows that black and Latino borrowers and borrowers in communities of color received government-backed loans – insured by the Federal Housing Administration (FHA) or guaranteed by the Department of Veterans Affairs (VA) – significantly more often than did white borrowers.  The findings indicate persistent mortgage redlining and raise serious concerns about illegal and discriminatory loan steering…. [T]he report shows a pattern of two-tiered lending, in which borrowers and communities of color received disproportionately fewer conventional mortgages and disproportionately more government-backed loans than did white borrowers and communities…. [T]he disproportionate prevalence of FHA loans in communities of color raises fair lending flags."  In particular, the 2012 Report observes that:  "In Los Angeles, homebuyers in neighborhoods of color received government-backed loans five times more often than did those in predominantly white neighborhoods…. [H]omeowners in

---

[17] Center for Responsible Lending, *The State of Lending in America & its Impact on U.S. Households,* at 44 (2012) (*available at* http://www.responsiblelending.org/state-of-lending/State-of-Lending-report-1.pdf).

[18] *Id*. at 45.

COMPLAINT FOR VIOLATION OF
THE UNFAIR COMPETITION LAW
010346-11  738893 V1

communities of color received FHA or VA refinance loans 6.5 times more often than did homeowners in predominantly white neighborhoods."[19]

**C.    BoA/Countrywide Intentionally Discriminated Against Minority Borrowers in Violation of the Fair Housing Act Throughout the Time Period 2004-2011 as Demonstrated by Former Bank Employees**

75.    Confidential Witnesses ("CWs") are former BoA/Countrywide employees responsible for making and/or underwriting loans on behalf of the Bank in the greater Los Angeles region.  CWs describe how the Bank has targeted minorities and residents of minority neighborhoods in and around Los Angeles for predatory lending practices.

76.    CW1 worked on a project in 2012-2013 for the U.S. Office of the Comptroller of the Currency ("OCC"), which was conducted by a business advisory and staffing firm, in order to audit BoA loans for fraud and evidence of financial harm to borrowers. She worked on location at BoA's office in Pasadena.  The OCC was looking at loans from 2010, 2011 and a portion of 2012.  She said that the OCC found, through the audits, many lending irregularities and evidence of harm to borrowers.  "We did find a lot of things."

77.    CW2 joined Bank of America in 2010 as a loan officer. Typical customers whom CW2 dealt with during her time at the bank were minority borrowers who were struggling under mortgages they could not afford.  They "really had difficulties" paying and were seeking loan modifications or anything" the bank could do to help them.

78.    CW3 was a loan officer for Countrywide in 2005. CW3 observed management encouraging loan officers to close loans for people who were not qualified, including many minorities in the LA area. CW3 also observed fellow loan

---

[19] California Reinvestment Coalition, *Paying More for the American Dream VI: Racial Disparities in FHA/VA Lending* (2012) (*available at* http://calreinvest.org/system/resources/W1siZiIsIjIwMTIvMDcvMTgvMTZfMzVfM jNfMV9wYXlpbmdtb3JlVklfbXVsdGlzdGF0ZV9qdWx5MjAxMl9GSU5BTC5wZ GYiXV0/payingmoreVI_multistate_july2012-%20FINAL.pdf).

- 28 -

1  officers pushing predatory loans on customers, a practice which hit minorities

2  particularly hard.

3       79.    CW4 was a loan officer for Countrywide and Bank of America through

4  the end of 2008. CW4 witnessed BoA pressuring salespeople to reach out to

5  depressed minority neighborhoods in the City of Los Angeles and push loan

6  refinancing and other loan products on minority applicants. She recalls targeting

7  minority groups with subprime loans, and according to CW4, BoA did not do enough

8  policing of its lending practices.

9       80.    CW5 worked as a senior underwriter at BoA from 2010 to 2011.

10  According to CW5, by 2010, BoA had changed the rules on low-income borrowers,

11  most of which borrowers no longer qualified to refinance out of bad loans they

12  previously got from BoA.  In CW5's experience, a dramatically smaller ratio of

13  minorities was being approved for loans processed by BoA in 2010-2011 as

14  compared to earlier years. Approvals of loan applications that crossed his desk were

15  mostly for white borrowers.

16       81.    CW6 worked for BoA as a first mortgage loan specialist/collector in

17  2009-11 and later as a contract mortgage claim file examiner III/independent

18  foreclosure reviewer in 2012-2013. She worked with delinquent customers

19  nationwide with BoA mortgages. Among the various options she discussed with

20  customers were loan modifications, special forbearance, allowing the home to go

21  into foreclosure, and a "cash for keys" option in which buyers could collect

22  payments for walking away from a home in good condition.

23       82.    CW7 worked as an underwriter for Countrywide from 2002 to 2007.

24  CW7 observed that Countrywide's payment and commission system incentivized

25  loan officers to steer borrowers into predatory loans, and that salespeople included

26  false information in loan applications made to unqualified applicants.

27

28

COMPLAINT FOR VIOLATION OF
THE UNFAIR COMPETITION LAW
010346-11  738893 V1

83.     CW8 worked at Countrywide from 2000 to 2011 as an underwriter in several different Los Angles branches, and as a member of the Company's Quality Control Department from 2008 to 2009. He underwrote "A paper" loans, also known as prime loans, and "A-minus" loans that were sold with teaser rates, balloon payments, and/or payment option plans, as well as HELOCs.

84.     CW9 worked as an underwriter for Countrywide.  CW9 underwrote loans that included adjustable rates, balloon payments, no document and stated income loans.  In his experience, mortgage brokers for Countrywide pushed underwriters to approve predatory loans for minority applicants, and management encouraged underwriters to ignore proper underwriting criteria.

**1.     BoA/Countrywide targets minorities for predatory loan terms.**

85.     CW3 will testify that:

Countrywide had what it called an "elite team" of loan salespeople working at the Van Nuys office who were encouraged by management to do or say anything to close as many loans as possible.

Countrywide's salespeople, management and underwriters on this "elite team" approved loans for people who were not qualified, including many minorities in the LA area.

Countrywide salespeople, management and underwriters on this "elite team" were aware of false information submitted on loan applications, but ignored it, encouraged it and/ or sometimes inserted it themselves so that the loans would be approved.

Countrywide's loan salespeople on this "elite team" aggressively enticed and in some cases coerced current Countrywide customers to refinance into bigger loans with

- 30 -

often higher rates, even when the financials of the new loan were not beneficial to the borrower.  This was known and encouraged by Countrywide management.

Countrywide's salespeople on this "elite team" added points to loans, pushed customers to borrow more than they needed and set higher rates than necessary whenever possible.

Countrywide loan salespeople targeted people who lacked education and an understanding of mortgages and loans, a practice that hit minorities particularly hard.

86.   CW4 will testify that:

Bank of America had "this huge push" in 2008 for loan officers to reach out to "very depressed neighborhoods" in the City of Los Angeles where people were struggling to pay their mortgages.  The witness recalled setting up kiosks on weekends with her manager at black churches around Los Angeles to reach out to people who were having trouble with loans and offer various services, such as refinancing and modifications.

She and some of her black coworkers were upset that they were being asked to market to minority communities, in part because the odds that they could offer real help to distressed minority homeowners were low because many would not qualify. "We were angry," she said.

She said she felt under "an extreme amount of pressure" during her employment to make her loan quotas, which

leaves her bitter to this day.  She also felt BoA did not do
"enough policing" of its loans and there "was a lot going
on that was not properly monitored."

87.     BoA/Countrywide also targeted minority churches and their
congregations for subprime loans.  During her time at Bank of America in 2007 and
2008, CW4 recalled giving up a lot of her Saturdays to go with her manager to set up
kiosks at certain churches.  "They were all in very depressed neighborhoods," CW4
stated.  "We were doing this huge push, where we were targeting lower-income
areas, and we actually were having seminars and expos, where we'd actually go to
various churches."  She recalled that the names of some of the churches were West
Angeles, Faithful Central, and City of Refuge.  She said all were in Los Angeles and
were "predominantly African-American."

88.     CW4 recalls that BoA would find people "who were in trouble and
having problems with their mortgage, have them come in, and I remember
refinancing at least a couple of people."  BoA even pushed minority employees to
target churches on the basis of race.  For example, BoA asked her and some of her
black coworkers to market to minority communities, which she said she could recall
"because I had a black coworker who used to say, 'I don't like that they're always
trying to push us as black people into neighborhoods to deal with low-income
blacks.'"

89.     CW4 explained:  "We were targeting people with subprime loans who
were struggling and the likelihood of us being able to sell them property of if they
were in a property and had to refinance, the likelihood was very low" that such
refinancing would occur.  It was understood what was going on, "she said of the
marketing program to African-American and Hispanic areas.  "I had a couple
coworkers.  It was understood what was going on.  We were angry."

- 32 -

COMPLAINT FOR VIOLATION OF
THE UNFAIR COMPETITION LAW
010346-11  738893 V1

10.    CW4 said:  "It was understood that this was the prime target, would be that particular demographic, and that particular demographic was unfortunately minorities who were struggling in their loans and who couldn't pay their mortgages." "That's when we started to go into the most depressed areas, the inner city of LA."

90.    CW4 also said that she "hated" adjustable-rate loans because she "knew what it meant" but said that they were definitely offered to some customers of BoA/Countrywide.  "It was discretionary."  "While I may not have agreed with some of the loan officers' choices, it was up to their discretion, whatever it is that their client agreed to do."

91.    The loans that CW1 reviewed for the OCC project mostly involved low-income borrowers across the U.S., including many in the City of Los Angeles.  "We were looking for specific things, fees charged to see if any harm was done to the borrower" financially, she said.  She explained that among the loans she audited were those with teaser rates that ballooned after an initial period, stated income loans and no doc loans with incomes exaggerated by BoA loan officers.  She saw a lot of African-Americans and other minorities from the City of Los Angeles and around the country who were harmed by BoA's loan practices and processes, many of whom had already lost their homes to foreclosure.

92.    CW6 said that minority borrowers appeared to be lacking even an "elementary-level" understanding of the mortgages into which they had been placed. "When the loan would go into default, we had to explain to them what that meant and what the next steps were," she said.  "It was kind of like explaining them to someone that didn't have a mortgage.  But they did have a mortgage."

93.    CW8 said that he and other underwriters were under intense pressure to process loan application files, and if they did not meet their quotas they could be written up or eventually fired. Due to the pressure to approve loans at Countrywide from 2000 to 2011, questionable applications were rushed through the approval

- 33 -

process. In addition to the quota pressure, underwriters sometimes faced pressure from loan officers and management not to reject loans even if they failed to meet the loans' criteria.

94.     CW8 also said that underwriters were advised to discard documents that would kill the loan, such as evidence that stated income had been manipulated. When he rejected a loan application, he would see the same file return as a new application with different documentation.  He said management sometimes approved loans that did not meet underwriting criteria.

95.     When CW8 was transferred to the quality control department, he began to audit loan applications that had ended up in foreclosure.  He said that at least 50 percent of those loans should not have been approved because they violated the Company's underwriting rules.  He found multiple incidents of applications with fraudulent, incomplete and questionable information and documentation.

96.     CW9 worked as a senior underwriter in Countrywide's wholesale lending department in Southern California between 2002 and 2007.  He underwrote loans that included adjustable rates, balloon payments, no document and stated income loans.  All of the no documentation, stated income loans had higher interest rates than documented, prime loans.

97.     In CW9's experience, Countrywide tailored some of its mortgage products to entice minorities into teaser rate loans that they were not qualified for after the payments increased.  These loans included negative amortization loans, which offered extremely low starting interest rates (like 1.25%) and balloon payments.  After 6 months to a year, the rates would skyrocket 4 or 5 times over (*e.g.*, 5%-6% or more).  Plus, the difference between the monthly payment at the teaser rate and the payment at the increased rate was tacked on to the loan principal amount.  Countrywide qualified borrowers based on the initial teaser rate to get them approved for the loan.  The lender did not qualify the borrower based on the higher

- 34 -

rate and payment.  "So when the rate goes up, the (borrower) can't afford the loan anymore," he said.  Countrywide salespeople pushed these loan products on minorities, enticing them with the idea of very small payments that would get them into a nice house that was in reality more than they could afford.

98.     According to CW9, mortgage brokers showered underwriters with gifts. Loan officers also pushed underwriters to approve questionable loans for minority applicants by arguing the borrowers' "culture" played a role in why they should be approved for the subprime loan.  For example, if a Hispanic borrower applied for a stated income loan and the underwriter questioned the high level of income claimed, the loan officer would assert that in Hispanic culture many members of the family would be living in the home and would be assisting with the mortgage payments.

99.     Some underwriters felt pressure to approve questionable loans. Furthermore, even though CW9 personally rejected a number of loan applications, someone in upper management approved some of the same loans anyway, especially with loans submitted by top producing brokers and salesmen.

**2.    BoA/Countrywide gives its employees discretion to steer people into predatory loans (and pays its employees more for doing so).**

100.   The confidential witness statements demonstrate that BoA/Countrywide steered borrowers into loans with more onerous terms than necessary.  Notably, CW3 explained that Countrywide encouraged salespeople to do or say anything to close as many loans as possible, targeting minority neighborhoods in the process. Countrywide coerced or enticed customers to refinance into bigger loans with worse terms.  Countrywide's salespeople had the discretion to add points to loans, push customers to borrow more than they needed, and set higher rates than necessary whenever possible.  Likewise, CW4's statements underscore that BoA made a huge push to market to struggling minority neighborhoods, and gave loan officers discretion to make whatever loans the customers might accept.

COMPLAINT FOR VIOLATION OF
THE UNFAIR COMPETITION LAW
010346-11 738893 V1

101.   BoA has used a commission-only compensation system for loan officers, tied to loan basis points, with monthly loan goals and higher commissions for higher totals, according to CW2.  The compensation structure imposed substantial pressure to close loans and maximize loan points. Adding to that pressure, she said, loan officers routinely were indebted to BoA because they were paid a 'draw' (*e.g.*, about a few thousand dollars every month), to be repaid from mortgage sales commissions.  If a loan officer failed to pay off the draw in the course of the month, the debt would roll-over to the next month, adding to the sales pressure.  "There were loan officers that were always in the negative, always," CW2 said.

102.   Similarly, CW7 said that Countrywide's payment and commission system incentivized loan officers to steer borrowers into subprime loans.  CW7 said Countrywide paid its salespeople more for closing subprime loans than for prime loans, which motivated loan officers to put as many people in subprime as they could.  "They are going to take prime people and put people in subprime because they make more money," he said.

103.   Similarly, BoA/Countrywide pressured and incentivized underwriters to approve dubious loans.  CW8 and CW9 observed that, through bonuses, quotas, and threats of disciplinary action, Countrywide's management encouraged underwriters to approve loans even when such loans failed to meet underwriting criteria (and sometimes management itself approved loans that the underwriters rejected).  Loan officers also gave gifts and paid underwriters kick-backs to underwriters to approve their loans quickly.

104.   CW8 also explained that the Bank's salespeople more easily took advantage of minorities.  He believes the salespeople could easily convince new Hispanic borrowers, in particular, that Countrywide could help them afford to buy a home.  And, when the borrower was a minority, CW8 said managers told

COMPLAINT FOR VIOLATION OF
THE UNFAIR COMPETITION LAW
010346-11  738893 V1

underwriters to approve the loan even if it fell short of underwriting criteria such as debt-to-income ratios. He recalls management "would come back and say, 'you know this person is a minority.  You can go a little higher (on debt ratio).'"

105.   Simply put, BoA/Countrywide incentivized salespeople to steer minority borrowers into more onerous loans than warranted by the circumstances, and BoA/Countrywide gave salespeople broad discretion to do so.  Indeed, this was part of a culture that focused only on making the most money possible and not on putting borrowers in loans that were appropriate for them.

### 3.   BoA/Countrywide underwrites adjustable rate loans that borrowers cannot afford.

106.   BoA/Countrywide originated "3/27" adjustable rate mortgages, negative-amortization loans with low teaser rates and low "pick-your-payment" monthly notes, marketed to borrowers from predominantly minority neighborhoods in Los Angeles.  Unless properly underwritten, such loans are destined to fail.

107.   BoA/Countrywide does not properly underwrite these loans when made to minorities and in minority neighborhoods.  BoA/Countrywide does not adequately consider the borrowers' ability to repay these loans, especially after the teaser rate expires and the interest rate increases.

108.   The confidential witness statements of CW4, CW5, CW1, CW8, and CW9 support that BoA/Countrywide underwrote these loans as if the teaser rate will apply for the full life of the loan instead of considering the borrowers' ability to repay the loan after the teaser rate expires.

109.   The use of negative amortization loans, pick-a-payment notes, 3/27 ARMs, and other adjustable loans in the manner described above is consistent with the practice of reverse redlining, has subjected minority borrowers to unfair and deceptive loan terms.

COMPLAINT FOR VIOLATION OF
THE UNFAIR COMPETITION LAW
010346-11  738893 V1

**4.     BoA/Countrywide gives its employees discretion to include balloon payments.**

110.   The confidential witness statements (such as those from CW5) further demonstrate that BoA/Countrywide loan officers had discretion to include onerous balloon payments in the terms and conditions of loans to minority borrowers prior to 2008, despite the fact that BoA/Countrywide would not qualify the same borrowers for subsequent refinancing.

111.   As CW1 and CW8 observed, BoA loan officers did not adequately explain the provisions of onerous balloon payment loans to applicants, and wrongly informed the applicants that they could refinance before the higher payments would become due.

112.   For example, CW8 describes one Hispanic customer who did not seem to understand the implications of a $700,000 loan he received that started at monthly payments of $2,000 then ballooned to $5,000 a month in one year.  "The loan officer told him, don't worry about (the balloon payment), you can refinance in a year. They always said that."  A year later, the borrower came back to try to refinance because he could not afford the $5,000 monthly mortgage payment.  But at that point, the principal amount was too high and the man did not qualify to refinance. He lost his home, said CW8.

**5.     BoA fails to offer refinancing or loan modifications to minority customers on fair terms, and otherwise limiting equal access to fair credit.**

113.   The confidential witness statements show that BoA failed to offer refinancing or loan modifications to minority customers on fair terms – which constitutes a particularly egregious form of redlining, given that minority borrowers sought refinancing or loan modifications with respect to bad loans that the Bank previously made to them.

114.   CW1 expressed that BoA customers were given loans with predatory terms, but wrongly advised by their loan officers at closing that they could refinance

- 38 -

at a later date.  CW1 said that a high rate of African-American and Hispanic people "were taken advantage of" by BoA.  She said that many BoA borrowers did not understand their loans, why the payments had become so unaffordable, and why they could not refinance to a lower rate and payments.  In particular, she said that BoA customers who had loans with teaser rates and stated income loans were told by loan officers when they closed the loans that they would be able to refinance later, such as when monthly payments adjusted higher.  Many of these customers felt they were "scammed" by BoA, lied to and ripped off because they were later told by the bank that they did not qualify to refinance.  Many of these same people subsequently lost their homes to foreclosure.

115.   CW1 also said BoA "dropped the ball" with many loan customers in the middle of the process of working out a late payment plan and/or a loan modification. Many of these customers were foreclosed on unexpectedly, and without warning, during what they believed was a modification process by BoA that never resulted in new loans.  "You could see in the loan notes the borrower contacted the bank, they were trying to work with the bank, and for some reason the bank would foreclose on them when they were in the middle of the modification process."  The bank "didn't even send them out a piece of paper to warn them they were going to do it," she said.

116.   CW2 was frequently told to tell struggling customers that they should call the Bank to discuss modifications.  But the customers who came into her office often reported that they had already done so repeatedly and were transferred from person to person, getting nowhere.  These experiences prompted many customers to try coming into the Bank in person.  "They were just complaining and crying that, 'We tried, and there's no help, they were just passing us from desk to desk,' "she said, recalling what borrowers would tell her.

117.   CW2 observed borrowers who were struggling to pay mortgages but should have qualified for refinancing would face inexplicably long processing delays

- 39 -

that often led them to fall further behind in payments, compounding their problems. Processes that should have taken 30 days would instead drag on for 120 days or longer, even for customers who appeared to qualify on paper.  CW2 noted that BoA's high-pressure commission structure further discouraged BoA loan officers from refinancing existing customers.

118.   CW4 explained that BoA targeted minority neighborhoods with onerous loans for which the likelihood was very low that the Bank would offer refinancing.

119.   CW5 confirmed that, by 2010, BoA had changed the rules on low-income borrowers and no longer qualified them to refinance out of bad loans they previously got from BoA.  Consequently, since then, the ratio of minorities who were being approved for loans at BoA decreased dramatically.  In CW5's experience, a dramatically smaller ratio of minorities was being approved for loans processed by BoA in 2010-2011 in comparison to earlier years.

120.   Prior to 2008, CW5 explained, BoA qualified people for negative-amortization loans with low teaser rates or low "pick-your-payment" monthly notes.  But once the adjustment kicked in and raised the monthly amount due, the borrower was no longer qualified and could not afford the mortgage.  When borrowers could no longer afford a loan with payments that adjusted higher, they often would miss payments.  But when they tried to refinance, BoA would reject the borrowers because they had missed payments.  Even if these borrowers had not missed payments, CW5 said that it is still likely that, under the newer guidelines, BoA would not offer refinancing to many of these low-income borrowers.  He said that this practice hits minority people hard.

121.   In the last few years, CW5 said, there were not a lot of loans to approve for Hispanic or African-American borrowers.  Under the newer guidelines, most of the loans crossing his desk were white.  According to CW5, many minority borrowers who were able to qualify for loans prior to 2008, including the subprime,

COMPLAINT FOR VIOLATION OF
THE UNFAIR COMPETITION LAW
010346-11  738893 V1

1    negative amortization, and other types of balloon payment loans, have found

2    themselves in the last several years unable to qualify for any kind of loans, even ones

3    they previously got.

4        122.   According to CW6, BoA encouraged her to tell struggling customers

5    who did not qualify for a loan modification (under the Bank's stricter guidelines) that

6    they should stop making payments so that they would go into foreclosure.

7    "Management would tell us, if the borrower doesn't qualify because they're not in

8    foreclosure, because they aren't delinquent in the system, tell them to call us back

9    when they can't pay their mortgage anymore."

10       **6.      BoA/Countrywide engages in other abusive lending practices.**

11       123.   Confidential witnesses like CW7 and CW8 also learned how some

12   Countrywide loan officers had, among other things:  (1) falsified documents to make

13   expensive mortgages seem affordable, (2) told customers their specific income level

14   "didn't matter," and (3) sold customers on one type of loan, only to sign them to

15   another, more onerous loan, in a sort of bait-and-switch.  The incidents of fraud were

16   rampant.

17       124.   Notably, CW7 and CW8 observed a tactic that salespeople used to

18   increase their commissions and earn more money for Countrywide – namely,

19   including a HELOC on the loans regardless of whether the homeowner asked for it

20   or even wanted it.  At the loan signing, the HELOC would simply be included.  If the

21   borrower asked about it, the salespeople would say it won't cost them anything, and

22   it's only there if they need it.  CW7 said this was standard practice at Countrywide.

23   CW8 added that Countrywide included HELOCs with all of its first mortgage loans

24   regardless of whether the borrower applied for it.

25       125.   CW7 also said that with "stated income" loan products, the salespeople

26   used a number of tricks to make sure the applicants ended up in subprime.  Examples

27   include adding a spouse with bad credit to a loan application by a spouse with good

28

- 41 -

COMPLAINT FOR VIOLATION OF
THE UNFAIR COMPETITION LAW
010346-11  738893 V1

credit, or leaving off the salary of a spouse needed to show sufficient income for other loan products.  Alternatively, loan officers would exaggerate the borrowers' income.  Due to the amount of inaccurate and fraudulent information regularly included in such loans, CW7 said they were referred to as "liar loans" at Countrywide.

**D.     Minorities in Fact Receive Predatory Loan Terms from BoA/Countrywide**

126.   As discussed herein, BoA/Countrywide's *predatory* loans include: high-cost loans (*i.e.*, loans with an interest rate that was at least three percentage points above a federally-established benchmark), subprime loans, interest-only loans, balloon payment loans, loans with prepayment penalties, negative amortization loans, no documentation loans, and/or ARM loans with teaser rates (*i.e.*, lifetime maximum rate > initial rate + 6%).

127.   Data reported by the Bank and available through public databases shows that in 2004-2011, 14.7% of loans made by BoA/Countrywide to African-American and Latino customers in Los Angeles were high-cost, but only 4.2% of loans made to white customers in Los Angeles were high-cost.  This data demonstrates a pattern of statistically significant differences in the product placement for high cost loans between minority and white borrowers.[20]

128.   The following map of BoA/Countrywide predatory loans originated in Los Angeles between 2004-2011 illustrates the geographic distribution of predatory loans in African-American and Latino neighborhoods and white neighborhoods in Los Angeles.  This map demonstrates that BoA/Countrywide's predatory loans are disproportionately located in minority neighborhoods.

---

[20] As alleged throughout the complaint, all references to the date range 2004-2011 are intended to include the time period up to and including December 31, 2011.

- 42 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16



17   129.   The fact that predatory loans involving all of BoA/Countrywide's loan

18   products are more heavily concentrated in minority neighborhoods in Los Angeles is

19   consistent with the practice of reverse redlining.

20   **E.   Minorities in Los Angeles Receive Such Predatory Loan Terms from BoA/Countrywide Regardless of Creditworthiness**

21

22   130.   According to *Discretionary Pricing, Mortgage Discrimination, and the*

23   *Fair Housing Act*, 45 HARVARD CIVIL RIGHTS-CIVIL LIBERTIES LAW REV. 375, 398

24   (2010), several studies dating back to 2000 have established that minority borrowers

25   were charged higher interest rates/fees than similar creditworthy white borrowers.

26   131.   Likewise, according to *A Racial Financial Crisis*, 83 TEMPLE LAW REV.

27   941, 947, 949 (2011), one study concluded that "[e]ven after controlling for

28   underwriting variables, African-American borrowers were 6.1% to 34.3% more

- 43 -

likely than whites to receive a higher rate subprime mortgage during the subprime boom." And another study found that significant loan pricing disparity exists among low risk borrowers – African-American borrowers were 65% more likely to receive a subprime home purchase loan than similar creditworthy white borrowers, and 124% more likely to receive a subprime refinance loan.[21]

132.   Similarly, the Center for Responsible Lending's November 2011 Report, *Lost Ground, 2011:  Disparities in Mortgage Lending and Foreclosures*, at 21-22, stated it is "particularly troublesome" that minorities received riskier loans "even within [similar] credit ranges." For example, among borrowers having FICO scores above 660, the incidence of higher rate loans among various groups was as follows:  whites – 6.2%; African-American – 21.4% (3.5 times white rate); and Latino – 19.3% (3.1 times white rate).

133.   Moreover, data reported by the Bank and available through both public and private databases shows that minorities in Los Angeles received predatory loan terms from BoA/Countrywide more frequently than white borrowers, regardless of creditworthiness.

134.   A regression analysis of this data controlling for borrower race and objective risk characteristics such as credit history, loan-to-value ratio, and the ratio of loan amount to income demonstrates that, from 2004-2011, an African-American borrower was 1.522 times more likely to receive a predatory loan as was a white borrower possessing similar underwriting and borrower characteristics. The regression analysis further demonstrates that the odds that a Latino borrower would receive a predatory loan were 1.325 times greater than that of a white borrower possessing similar underwriting and borrower characteristics. These odds ratios

---

[21] Center for Responsible Lending, *Unfair Lending: The Effect of Race and Ethnicity on the Price of Subprime Mortgages* (2006) (internal citation omitted) (*available at* http://www.responsiblelending.org/mortgage-lending/research-analysis/rr011-Unfair_Lending-0506.pdf)

- 44 -

demonstrate a pattern of statistically significant differences between African-American and white borrowers and between Latino and white borrowers.

135.   The regression analysis also shows that these disparities persist when comparing only borrowers with FICO scores above 660.  An African-American borrower with a FICO score above 660 was 1.396 times more likely to receive a predatory loan as was a white borrower with similar underwriting and borrower characteristics.  A Latino borrower with a FICO score above 660 was 1.167 times more likely to receive a predatory loan as was a white borrower with similar underwriting and borrower characteristics.  These odds ratios demonstrate a pattern of statistically significant differences between African-American and white borrowers and between Latino and white borrowers.

136.   A similar regression analysis taking into account the racial makeup of the borrower's neighborhood rather than the individual borrower's race shows that borrowers in heavily minority neighborhoods in Los Angeles were more likely to receive predatory loans than borrowers in heavily white neighborhoods.  For example, a borrower in a heavily minority census tract (census tract consisting of at least 80% African-American or Latino households) was 1.676 times more likely to receive a predatory loan as was a borrower with similar characteristics in a heavily white neighborhood (census tract with at least 80% white households).  These odds ratios demonstrate a pattern of statistically significant differences between African-American and white borrowers and between Latino and white borrowers.

137.   This data also establishes that BoA/Countrywide disproportionately issued government loans with higher risk features (FHA/VA) to African-American and Latino borrowers in Los Angeles from 2009-2012.  A regression analysis, controlling for borrower race and objective risk characteristics such as ratio of loan amount to income, demonstrates that an African-American borrower was 5.600 times more likely to receive a higher risk government loan than was a white borrower

- 45 -

possessing similar borrower and underwriting characteristics.  The regression analysis further demonstrates that a Latino borrower was 3.952 times more likely to receive a higher risk government loan than was a white borrower possessing similar borrower and underwriting characteristics.  These odds ratios demonstrate a pattern of statistically significant differences between African-American and white borrowers, and between Latino and white borrowers.

138.   Thus, the disparities are not the result of, or otherwise explained by, legitimate non-racial underwriting criteria.

## VII.   STATUTE OF LIMITATIONS AND CONTINUING VIOLATIONS DOCTRINE

139.   As alleged herein, Defendant BoA/Countrywide has engaged in a continuous pattern and practice of mortgage discrimination in Los Angeles since at least 2004 by imposing different terms or conditions on a discriminatory and legally prohibited basis.  In order to maximize profits at the expense of minority borrowers, BoA/Countrywide adapted its unlawful discrimination to changing market conditions.  This unlawful pattern and practice conduct is continuing through the present and has not terminated.  Therefore, the operative statute of limitations governing actions brought pursuant to UCL has not commenced to run.

## VIII.  CLAIM FOR RELIEF

## CLAIM FOR RELIEF

**(Violation of the Unlawful Prong of the Unfair Competition Law based on violation of the Federal Fair Housing Act, 42 U.S.C. §§ 3601, *et seq.*)**

140.   Plaintiff repeats and incorporates by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

141.   Defendants have engaged in, and continue to engage in, acts or practices that constitute unfair competition in violation of the unlawful prong of section 17200 of the California Business and Professions Code, premised on violation of the federal Fair Housing Act.

- 46 -

COMPLAINT FOR VIOLATION OF
THE UNFAIR COMPETITION LAW
010346-11 738893 V1

142.   The Fair Housing Act's stated purpose is to provide, "within constitutional limitations, for fair housing throughout the United States."

143.   In contravention of that purpose, BoA/Countrywide's acts, policies, and practices as described constitute intentional lending discrimination on the basis of race.  BoA/Countrywide has intentionally targeted residents of predominantly African-American and Latino neighborhoods in Los Angeles for different treatment than residents of predominantly white neighborhoods in Los Angeles with respect to mortgage lending.  BoA/Countrywide has intentionally targeted residents of these neighborhoods for high-cost loans without regard to their credit qualifications and without regard to whether they qualify for more advantageous loans, including prime loans.  BoA/Countrywide has intentionally targeted residents of these neighborhoods for increased interest rates, points, and fees, and for other disadvantageous loan terms including, but not limited to, adjustable rates, prepayment penalties, and balloon payments.  BoA/Countrywide has intentionally targeted residents of these neighborhoods for unfair and deceptive lending practices in connection with marketing and underwriting mortgage loans.

144.   BoA/Countrywide's acts, policies, and practices have had an adverse and disproportionate impact on African-Americans and Latinos and residents of predominantly African-American and Latino neighborhoods in Los Angeles as compared to similarly situated whites and residents of predominantly white neighborhoods in Los Angeles.  This adverse and disproportionate impact is the direct result of BoA/Countrywide's policies of providing discretion to loan officers and others responsible for mortgage lending; failing to monitor this discretion to ensure that borrowers were being placed in loan products on a nondiscriminatory basis when BoA/Countrywide had notice of widespread product placement disparities based on race and national origin; giving loan officers and others responsible for mortgage lending large financial incentives to issue loans to African-

- 47 -

Americans and Latinos that are costlier than better loans for which they qualify; otherwise encouraging and directing loan officers and others responsible for mortgage lending to steer borrowers into high-cost loans or loans with adjustable rates, prepayment penalties, or balloon payments without regard for whether they qualify for better loans, including but not limited to prime loans; and setting interest rate caps.  These policies have caused African-Americans and Latinos and residents of predominantly African-American and Latino neighborhoods in Los Angeles to receive mortgage loans from BoA/Countrywide that have materially less favorable terms than mortgage loans given by BoA/Countrywide to similarly situated whites and residents of predominantly white neighborhoods in Los Angeles.

145.   BoA/Countrywide's residential lending-related acts, policies, and practices constitute reverse redlining and violate the Fair Housing Act, and therefore the unlawful prong of the UCL, as:

(a)   Discrimination on the basis of race and national origin in making available, or in the terms and conditions of, residential real estate-related transactions, in violation of 42 U.S.C. § 3605(a); and

(b)   Discrimination on the basis of race and national origin in the terms, conditions, or privileges of sale of a dwelling, in violation of 42 U.S.C. § 3604(b).

146.   BoA/Countrywide's policies or practices are not justified by business necessity or legitimate business interests.

147.   BoA/Countrywide's policies and practices are continuing.

148.   BoA/Countrywide's policies and practices, as described herein, have had the purpose and effect of discriminating on the basis of race or national origin. These policies and practices were intentional, willful, or implemented with reckless disregard for the rights of African-American and Latino borrowers.

COMPLAINT FOR VIOLATION OF
THE UNFAIR COMPETITION LAW
010346-11  738893 V1

149.   Plaintiff has a substantial interest in protecting the well-being of its populace – and particularly in securing its residents from discrimination and ensuring "fair housing throughout the United States."

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), the People demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, the People respectfully prays that the Court grant it the following relief:

A.   Pursuant to Business and Professions Code section 17203, that all Defendants, their employees, agents, representatives, successors, assigns, and all persons who act in concert with them be permanently enjoined from committing any acts of unfair competition, including the violations alleged in the First Cause of Action.

B.   Pursuant to Business and Professions Code section 17206, that Defendants, and each of them, be ordered to pay a civil penalty in the amount of two thousand five hundred dollars ($2,500.00) for each violation of Business and Professions Code section 17200, in an amount according to proof.

C.   That Plaintiff recovers its costs of suit.

D.   For reasonable attorneys' fees; and

E.   For such other equitable relief as is just and proper.

DATED:  December 19, 2014      By: /s/ Michael N. Feuer
                                   Michael N. Feuer (SBN 111529)
                                   City Attorney
                                   James P. Clark (SBN 64780)
                                   Chief Deputy City Attorney
                                   CITY OF LOS ANGELES
                                   200 N. Main Street, Room 800
                                   Los Angeles, CA 90012
                                   Phone: (213) 978-8100
                                   Mike.feuer@lacity.org
                                   James.p.clark@lacity.org

- 49 -

COMPLAINT FOR VIOLATION OF
THE UNFAIR COMPETITION LAW
010346-11 738893 V1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Steve W. Berman
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA  98101
Telephone:  (206) 623-7292
steve@hbsslaw.com

Elaine T. Byszewski (SBN 222304)
Lee M. Gordon (SBN 174168)
Christopher R. Pitoun (290235)
HAGENS BERMAN SOBOL SHAPIRO LLP
301 North Lake Avenue, Suite 203
Pasadena, CA  91101
Telephone:  (213) 330-7150
elaine@hbsslaw.com
lee@hbsslaw.com

Joel Liberson (SBN 164857)
Howard Liberson (SBN 183269)
TRIAL & APPELLATE RESOURCES, P.C.
400 Continental Blvd., 6th Floor
El Segundo, CA  90245
Telephone:  (310) 426-2361
joel@taresources.com
howard@taresources.com

Robert Peck
CENTER FOR CONSTITUTIONAL
LITIGATION
777 6th Street NW, Suite 520
Washington, DC  20001
Telephone:  (202) 944-2803
Robert.peck@cclfirm.com

Clifton Albright (SBN 100020)
ALBRIGHT YEE & SCHMIT
888 West 6th Street, Suite 1400
Los Angeles, CA  90017
Telephone: (213) 833-1700
clifton.albright@ayslaw.com

*Attorneys for Plaintiff the People of the State
of California*

- 50 -

COMPLAINT FOR VIOLATION OF
THE UNFAIR COMPETITION LAW
010346-11  738893 V1